Young, &c.
*vs*
Stallings, &c.

---

## Young, &c. *vs* Stallings, &c.

### Error to the Marion Circuit.

#### *Fraudulent conveyances.*

Judge Marshall delivered the opinion of the Court.

This bill impeaches as fraudulent, a sale of three negroes, made by Woodward, a debtor of the complainant's, to his sister-in-law, Milly F. Stallings, and prays that said

Chancery.

*Case* 74.

April 17.

The object of the bill.

slaves be subjected to the satisfaction of the demands against Woodward, set up in the bill. The alledged fraud is denied by the answers; and the bill having been dismissed, the only question for our consideration has been, whether the fraud is sufficiently established.

There is no doubt, that at the time of the sale, Woodward was in desperate circumstances. Several executions were already in hand against him, and other demands greatly beyond his means of payment, were pressing on. Milly F. Stallings, an unmarried female between forty and fifty years of age, was herself a creditor. A considerable proportion of her scanty means consisted in her demands against Woodward, amounting to between $400 and $500. Another brother-in-law, at whose house she lived, and who was himself in embarrassed circumstances, advised her to secure her debt on Woodward, with whom all her near relations in the neighborhood seem to have been more or less involved. Under these circumstances, it was a measure of prudence on her part, and one which is sanctioned by law, to secure herself if she could fairly do it by means of Woodward's property. And as he might rightfully secure one creditor in preference to another, a willingness and even solicitude to secure a preference to this female, who though a relative, was not a member of his household, is not condemned either by law or good conscience, and affords in itself but slight ground, if any, for suspecting the good faith of the transaction.

If Milly F. Stallings had taken the property of Woodward as payment at a fair price, and to the precise value of her just demand, to be held for her own use, and not in trust for him, it would seem to be difficult, if not impossible to invalidate the transaction as fraudulent, whatever may have been the general disposition of Woodward to hinder and delay his creditors, and whatever might have been his motive for yielding a preference in the particular instance. And although in this case the purchase exceeded the amount of indebtedness, still if the excess was reasonably necessary for attaining the lawful purpose of satisfying the actual debt, the purchase to the whole extent may be attributed to the same motive of self inter-

A creditor may rightfully purchase the property of his failing debtor to the extent of his demand, and even if the purchase exceed the demand, the purchase will not be invalidated unless there be other considerations calculated to show a fraudulent intent.

est, and therefore the mere fact of the excess should not of itself invalidate the transaction, unless there be other circumstances tending to show a fraudulent intent on the part of the purchaser.

The property purchased in this case, consisted of a negro woman and her two infant children, one three and a half, and the other one and a half years of age. The price was $900, of which about $660 were paid in notes of Woodward and others, all of which seem to have been made available to the discharge of so much of Woodward's debts to the purchaser and others. The remaining $240 were paid in money at the date of the sale, and it does not appear what disposition was made of this sum by Woodward.

If a creditor has a right to purchase his debtor's property in satisfaction, he has surely the right, with the debtor's consent, to take that which will be available to himself. It does not appear that Woodward had any acceptable means of paying the debt to M. F. Stallings, except this negro woman and her three children, the eldest of whom was about six or seven years old, and was afterwards sold under execution at the price of $250. This one would not have paid the debt. The mother alone was available for present service or profit. And although her value as fixed in the actual transaction somewhat exceeded the debt, and although she and her two younger children cannot be said to have been actually inseperable, yet the natural disposition to keep them together, and the propriety of doing which has been held to be sufficient to authorize a Sheriff to sell a mother and child together, would seem to furnish a sufficient and justifiable motive for purchasing the children with the mother. The fact, that the mother was a family servant that had passed to Mrs. Woodward on the death of the father of herself and the purchaser, may be regarded as furnishing a co-operating motive which is entitled to some weight. But in addition to this, M. F. Stallings held the notes of a brother and brother-in-law, to whom Woodward was indebted for land; and circumstances authorize the presumption, that one object of the purchase was, that while she should thereby realize these notes, which she was not entirely sure of doing, except in this mode, Woodward should, at the

same time, have the means of perfecting his title to the land, for the benefit of his creditors, all of which was actually done. If as to these notes, which gave her an indirect demand upon Woodward, she did not occupy precisely the attitude of his creditor, the fact that they were demands upon his creditors, entitled to be used and in fact used by him, not only in paying those creditors, but in furnishing means for paying others also, would seem to place this part of the transaction on as stable a basis as if she had been a direct creditor dealing with Woodward for the payment of these notes, and tends to repel any inference of fraud as to the whole transaction.

That a creditor purchased a negro woman and two children at $900, $240 more than the creditor demands, where they were family slaves, and it is not shown that the purchaser had a knowledge of an intention to commit fraud, or held in trust for the debtor, there was no ground to hold the transaction fraudulent.

These notes, together with the direct demand upon Woodward, make up two thirds of the agreed price of the slaves, and as the nature and condition of the property furnish a sufficient and reasonable motive for extending the purchase so as to include both of the children with the mother, the purchase is not, by reason of this extension, subject to be characterized as a voluntary interferance with a debtor's property, or to the unfavorable inference which might be authorized by an unnecessary conversion of his visible and accessible means, into such as were beyond the reach of his creditors. The purchase of the three slaves being fairly justifiable for the security of M. F. Stallings as a creditor, and because they ought not unnecessarily to have been separated, and two thirds of the agreed price having gone, by the actual intention of the parties and the nature of the transaction, to the satisfaction of Woodward's debts, it seems only necessary to say further, in regard to the validity of the consideration, that of the remaining third, sixty dollars, for which the purchaser's note was given, was afterwards paid by her to a creditor of Woodward, to whom it was assigned, and that there is no ground to suppose that either any part of that sum, or of the $240 paid in hand, was furnished by Woodward.

Was the consideration then, fairly adequate to the purchase? Upon this subject there is some discrepancy of opinion among the witnesses, some of whom, however, seem to consider the question rather with reference to a payment in the notes of embarrassed or insolvent men,

than to a payment in money. But Woodward's own debts should be deemed equivalent to money in the purchase of his own property. And as between him and M. F. Stallings, the entire consideration of $900 was equivalent to cash. The one had given full value for the notes and the other was bound to pay it; and they all paid Woodward's debts dollar for dollar. It is proved that in the spring of 1840, when this sale was made, times were hard and money not plenty. Two witnesses say that $900 was the fair value of the three slaves, while others go greatly beyond that sum in their estimate ; but looking to the condition of the times and the actual sales of slaves referred to by the witnesses, we think $900 may be assumed as the fair market value of the three, in question, although more might possibly have been obtained. One witness, indeed, says that Woodward, a few days before the sale, asked him $800 for the woman alone, but he does not say he would have given that price, or that she was worth it. And as this and several other circumstances relied on as tending to show a fraudulent disposition on the part of Woodward to secure these slaves to himself, occurred in the absence of M. F. Stallings, and so far as appears, were not communicated to her, they can have no bearing on the question of fraudulent intent on her part, by which alone the transaction can be vitiated.

But did Woodward secure the slaves to himself by this transaction? The possession was immediately delivered, and has ever since been retained by the purchaser, except so far as it has been interrupted by attempts to subject them to Woodward's debts. Did he secure even the price to his own use, otherwise than in the payment of his debts? As to $660, nearly three fourths of the price, it is clearly proved that that sum was appropriated to his debts, and it is only as to the remaining $240 paid in money, that there is room even for a suspicion that he may have kept it from his creditors, and may have intended so to do. But if this purpose existed on his part, and if it has been actually consummated, which is by no means certain, there is no proof nor even presumption, that the purchaser participated in such a design, unless

YOUNG, &c.
*vs*
STALLINGS, &c.

it be found in the fact that having but two thirds of the agreed price in notes on Woodward and his creditors, she paid towards the residue what money she had, ($240,) and executed her own note for the balance of about $60. If the purchase was a real one for the use of the purchaser, and not in trust for Woodward, we have already seen that it was justifiable in its whole extent, and it ought not to be invalidated by the fact that a small portion of the price was paid in money and not actually secured to the benefit of creditors. What might be the case if it were established that this portion of the price was paid in money, with the intent on both sides, that it should be withheld from creditors, need not be decided. We decide only that no unfavorable inference can be drawn from the single fact of making such a payment in completing a purchase by a creditor, the extent of which is fairly justifiable : Indeed no stress seems to have been laid upon this particular fact in the preparation of the case, but the allegation of fraud seems to have been rested upon the ground of a trust as to the slaves themselves, to be inferred from the alledged inadequacy of the consideration, from the supposed inability of M. F. Stallings to pay even the sum of $240; from her sympathy with Woodward's family and a desire to secure these slaves to their use; and from the circumstances attending the negociation and consummation of the purchase, which are supposed to indicate a desire of concealment.

Without detailing, or in this place discussing the evidence on all these points of accusation, we are of opinion that not one of them can be fairly assumed to exist, except the fact that M. F. Stallings is the sister of Mrs. Woodward, and sympathizes in the distress occasioned by the misfortune or imprudence of her husband. But a sufficient and proper motive for the purchase being found in its furnishing the only means of security to the purchaser as a creditor, the consideration being fairly adequate, and being wholly furnished by her, the slaves purchased having been taken and retained in her exclusive possession, and there being no evidence of any obligation or promise to yield a future interest in the slaves to Woodward; the mere conjecture that the purchaser may, from

kind feelings for her sister, afford to her some future assistance, which she is the better enabled to do by having realized in this purchase, debts which she might otherwise have lost, is wholly insufficient to establish fraud in a transaction possessing, in the particulars above referred to, the essential features of good faith.

It is not sufficient to say that no other creditor could have obtained these slaves upon the same terms, or that Woodward made the sale to his sister-in-law because he expected that her affection for his wife would induce some future favor or assistance to her. If the sale was for the fair market value of the slaves, actually paid to Woodward, without the intent on the part of the purchaser, to withdraw the price from the reach of creditors, for the benefit of the debtor, the purchaser has committed no fraud upon other creditors, though the purchase had been made expressly for the purpose of immediately settling the purchased property to the use of the vendor's wife and children. Such a purpose should undoubtedly excite the scrutiny of the Chancellor, to enquire strictly, whether the price was adequate, and actually furnished by the purchaser, and not intended to be withheld from creditors. But these points being settled in favor of the purchase, it could not be successfully assailed on the ground of the intended disposition of the property purchased. Much less can the purchase now in question be invalidated upon the mere conjecture that the purchaser may, under the promptings of sisterly affection, confer some benefit of this kind, or that such a benefit, to proceed from the same motives, may have been hoped for or expected at the time of the sale. It is a sufficient answer to any inference of fraud, founded upon such a conjecture, that a fair price was paid by the purchaser.

Wherefore, the decree is affirmed.

*Rountree & Fogle* for plaintiff: *Shuck* for defendants.

VOL. V.     40

A sale by a debtor to his single sister-in-law, of slaves at a fair price, in satisfaction of just debts due her, will not be fraudulent, though made under the belief that the property would be set over to the use of the debtor's wife and children.